**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| MARIE HILFERTY, on behalf of herself and all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> ORACLE CORPORATION and THE UNIVERSITY OF PENNSYLVANIA, <br><br> Defendants. | Case No.: 1:26-cv-00118 <br><br><br><br><br> **DEMAND FOR A JURY TRIAL** |

## CLASS ACTION COMPLAINT

Plaintiff Marie Hilferty ("Plaintiff"), individually and on behalf of all others similarly situated ("Class Members"), brings this action against Defendants Oracle Corporation ("Oracle") and The University of Pennsylvania ("Penn", and collectively, Defendants") alleging as follows.

### I. INTRODUCTION

1.      This class action arises from Defendants failure to properly secure and safeguard Plaintiff's and Class Members' sensitive personally identifiable information ("PII" or "Private Information"), from being stolen by cybercriminals in a foreseeable, preventable data breach ("Data Breach").

2.      Defendant Oracle is a multinational technology and enterprise software firm based in Austin, Texas.[1] Defendant Oracle provides database software and cloud computing software

---

[1] *About Oracle*, Oracle Corporation, https://www.oracle.com/corporate/ (last visited Jan. 16, 2026).

services to companies across the United States ("Defendant Oracle's Clients"), including Defendant Penn.

3.      Defendant Penn is a private university with roughly 30,000 students enrolled.

4.      In its ordinary course of business operations, Defendants store a substantial amount of highly sensitive personal identifiable information ("PII" or "Private Information") of current and former employees and/or students.

5.      By collecting, storin, and transmitting a substantial amount of Private Information, Defendants had – and continue to have - a resulting duty to ensure such Private Information remains confidential and is safeguarded from unauthorized access.

6.      Plaintiff brings this Complaint against Defendants for their failure to properly secure and safeguard the PII that they collected and maintained as part of their regular business practices, including Plaintiff's and Class Members' names, Social Security numbers, dates of birth, physical address, employment related information, financial account numbers, identification documents such as passports, driver's licenses, national ID numbers, signatures, and other sensitive information.

7.      The notorious cybergang, Clop, has already claimed responsibility for the Data Breach.[2]

8.      It is unknown for precisely how long the cybercriminals had access to Defendant' networks before the Data Brach were discovered. In other words, Defendants had no effective means to prevent, detect, stop, or mitigate breaches of its systems—thereby allowing cybercriminals unrestricted access to individuals' PII.

---

[2] https://www.z2data.com/insights/everything-you-need-to-know-about-the-oracle-data-breach (last visited Jan. 16, 2026).

9. On information and belief, cybercriminals were able to breach Defendants systems because Defendants failed to adequately train their employees on cybersecurity and failed to maintain reasonable security safeguards or protocols to protect the Class's PII. In short, Defendants failures placed the Class's PII in a vulnerable position—rendering them easy targets for cybercriminals.

10. Defendant failed to adequately protect Plaintiff's and Class Members' Private Information. This unencrypted, unredacted Private Information was compromised due to Defendants' negligent and/or careless acts and omissions and their utter failure to protect Plaintiff's and Class Members' sensitive data. Hackers targeted and obtained Plaintiff's and Class Members' Private Information because of its value in exploiting and stealing the identities of Plaintiff and Class Members. The present and continuing risk of identity theft and fraud to victims of the Data Breach will remain for their respective lifetimes.

11. In breaching its duties to properly safeguard Plaintiff's and Class Members' Private Information and give them timely, adequate notice of the Data Breach's occurrence, Defendants conduct amounts to negligence and/or recklessness and violates federal and state statutes.

12. Plaintiff brings this action on behalf of all persons whose Private Information was compromised as a result of Defendants failure to: (i) adequately protect the Private Information of Plaintiff and Class Members; (ii) warn Plaintiff and Class Members of Defendants inadequate information security practices; and (iii) effectively secure hardware containing protected Private Information using reasonable and effective security procedures free of vulnerabilities and incidents. Defendants conduct amounts at least to negligence and violates federal and state statutes.

13. Defendants disregarded the rights of Plaintiff and Class Members by intentionally, willfully, recklessly, or negligently failing to implement and maintain adequate and reasonable

measures to ensure that the Private Information of Plaintiff and Class Members was safeguarded, failing to take available steps to prevent an unauthorized disclosure of data, and failing to follow applicable, required, and appropriate protocols, policies, and procedures regarding the encryption of data, even for internal use. As a result, the Private Information of Plaintiff and Class Members was compromised through disclosure to an unknown and unauthorized third party. Plaintiff and Class Members have a continuing interest in ensuring that their information is and remains safe, and they should be entitled to injunctive and other equitable relief.

14.    Plaintiff and Class Members have suffered injury as a result of Defendants conduct. These injuries include: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) uncompensated lost time associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) actual misuse of the compromised data consisting of an increase in spam calls, texts, and/or emails; (viii) nominal damages; and (ix) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the Private Information.

15.    Plaintiff seeks to remedy these harms and prevent any future data compromise on behalf of herself, and all similarly situated persons whose personal data was compromised and stolen as a result of the Data Breach and who remain at risk due to Defendants inadequate data security practices.

## II. PARTIES

16.     Plaintiff is an adult individual and a resident of Philadelphia, Pennsylvania.

17.     Defendant Oracle is a corporation incorporated in Delaware and with its principal place of business at 2300 Oracle Way, Austin, Texas, 78741. The registered agent for service of process is Corporation Service Company dba CSC – Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, TX 78701.

18.     Defendant Penn is a Pennsylvania corporation with its principal place of business at 3451 Walnut Street, Philadelphia, PA 19104.

## III.   JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because the amount in controversy exceeds $5 million, exclusive of interest and costs, and the number of Class Members exceeds 100, many of whom (including Plaintiff) have different citizenship from Defendants. Defendant Oracle is a citizen of Texas.

20.     This Court has personal jurisdiction over Defendants because Defendant Oracle has its principal place of business and is headquartered in the Austin Division of the Western District of Texas, and Defendants engage in substantial and not isolated activity in this state.

21.     Venue is proper in the Austin Division of the Western District of Texas under 28 U.S.C. § 1391(b) because Defendant Oracle has its principal place of business in this District, operates in this District and a substantial part of the events or omissions giving rise to Plaintiff's and Class Members' claims occurred in this District.

## IV.  GENERAL FACTUAL ALLEGATIONS

### A.    Defendants Collected and Maintained Plaintiff's and Class Members' Private Information to Operate and Facilitate their Respective Businesses.

22.    Defendant Oracle is a multinational technology and enterprise software firm that provides database software services, including its Oracle E-Business Suite, to its Clients, including Defendant Penn.

23.    Defendant Penn is a private university in Philadelphia, Pennsylvania.

24.    As part of their businesses, Defendants collect and maintain the Private Information of numerous individuals, including Plaintiff and Class Members.

25.    The information held by Defendants at the time of the Data Breach included the unencrypted PII of Plaintiff and Class Members.

26.    Upon information and belief, Defendants made promises and representations that the PII they collect and store would be kept safe, confidential, that the privacy of that information would be maintained, and that Defendants would delete any sensitive information after they were no longer required to maintain it.

27.    Plaintiff and Class Members were required to entrust their highly sensitive Private Information to Defendants, either directly or indirectly, and in exchange, Defendants promised by implication to reasonably protect that sensitive data.

28.    Defendants knew that any breach and exposure of the data stored on its systems would result in the increased risk of identity theft and fraud for the thousands of individuals whose Private Information was compromised, as well as intrusion into those individuals' personal health matters.

29.     Defendants derived economic benefits from collecting Plaintiff's and Class Members' Private Information—their respective businesses are built for that precise purpose. Without the required submission of Private Information, Defendants could not perform their operations or generate revenue.

30.     Defendants had a duty to adopt reasonable measures to protect the PII of Plaintiff and the Class Members from involuntary disclosure to third parties.

31.     Despite recognizing their duty to do so, on information and belief, Defendants failed to implement reasonable cybersecurity safeguards or policies to protect Plaintiff and Class Members' PII or trained their IT or data security employees to prevent, detect, and stop breaches of their systems. Rather, Defendants chose to store Plaintiff and the Class Members' PII on an unsecure network, leaving their PII vulnerable for cybercriminals to take. As a result, Defendants leave significant vulnerabilities in their systems or third-party vendors systems, for cybercriminals to exploit and gain access to individuals PII.

**B.      Defendants Owed Duties to Adopt Reasonable Data Security Measures for Private Information they Collected and Maintained.**

32.     As part of their respective businesses, Defendants collect and maintain millions of individuals' Private Information, including that of Plaintiff and Class Members.

33.     Defendants had and continue to have duties to adopt reasonable measures to keep Plaintiff's and Class Members' Private Information confidential and protected from disclosure to unauthorized third parties, and to audit, monitor, and verify the integrity of their IT networks and those of their vendors and affiliates.

34.     Defendants obligations stem from the Federal Trade Commission ("FTC") Act, 15 U.S.C. § 45, common law, contract, industry standards, and representations made to Plaintiff and

Class Members, to keep their Private Information confidential and protected from unauthorized disclosure.

35.    Plaintiff and Class Members value the confidentiality of their Private Information and demand security to safeguard their Private Information. To that end, Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their Private Information.

36.    Based on the foregoing representations and warranties, Plaintiff and Class Members provided their Private Information to Defendants with the reasonable expectation and on the mutual understanding that Defendants would comply with their promises and obligations to keep such information confidential and protected against unauthorized access.

37.    Additionally, by obtaining, using, and benefitting from Plaintiff's and Class Members' Private Information, Defendants assumed legal and equitable duties and knew or should have known they are responsible for protecting that Private Information from unauthorized access and disclosure.

38.    Defendants duty to protect Plaintiff and Class Members from the foreseeable risk of injury that inadequate data protection and unauthorized exposure of their Private Information would cause obligated Defendants to implement reasonable practices to keep that Private Information confidential and securely maintained, to use and disclose it for necessary and authorized purposes only, to delete it from their network systems when no longer needed, and to ensure the same data security protocols and procedures from their vendors. Defendants failed to do so.

**C.    Defendants Failures to Adequately Safeguard Plaintiff's and Class Member's Private Information Caused the Data Breach.**

39.    In July 2025, Defendant Oracle was hacked in the Data Breach—which compromised the data of its enterprise consumers.[3]

40.    In particular, the notorious cybercriminal syndicate CL0P gained access to the PII of Plaintiff and Class Members.[4] Specifically, Cl0p "exploited what may be CVE-2025-61882 as a zero-day vulnerability against Oracle EBS customers as early as Aug. 9, 2025 . . . with additional suspicious activity dating back to July 10, 2025" and "the threat actor successfully exfiltrated a significant amount of data from impacted organizations."[5]

41.    To date, Cl0p has listed over 100 companies as victims of its cyberattack on Defendants.[6]

42.    Plaintiff's and Class Members' Private Information was targeted, accessed, and stolen by cybercriminals in the Data Breach. Criminal hackers accessed the Platform containing Plaintiff's and Class Members' Private Information, where they were kept without adequate safeguards and in unencrypted form.

43.    Defendants could have prevented this Data Breach by ensuring the files and servers containing Plaintiff's and Class Members' Private Information were properly secured, sanitized, and encrypted, but failed to do so.

44.    Defendants tortious conduct and breach of contractual obligations, as detailed in this Complaint, are evidenced by their failure to recognize the Data Breach until cybercriminals

---

[3] 6Oracle E-Business Suite Zero-Day Exploited in Widespread Extortion Campaign, GOOGLE THREAT INTELLIGENCE GRP. (Oct. 9, 2025) https://cloud.google.com/blog/topics/threatintelligence/oracle-ebusiness-suite-zero-day-exploitation

[4] *Id.*

[5] *Id.*

[6] https://www.z2data.com/insights/everything-you-need-to-know-about-the-oracle-data-breach (last visited Jan. 16, 2026).

had already infiltrated and obtained Plaintiff's and Class Members' Private Information—meaning Defendants had no effective means in place to ensure foreseeable attacks were detected and prevented.

**D.    Defendants Knew of the Risk of a Cyberattack because Companies in Possession of PII are Particularly Suspectable.**

45.    Defendants' negligence in failing to safeguard Private Information is exacerbated by the repeated warnings on the need to protect and secure sensitive PII.

46.    Private Information of the kind accessed in the Data Breach is of great value to cybercriminals as it can be used for a variety of unlawful and nefarious purposes, including ransomware, fraudulent misuse, and sale on the internet black market known as the dark web.

47.    Private Information can also be used to distinguish, identify, or trace an individual's identity, such as their name and Social Security number. This may be accomplished alone, or in combination with other personal or identifying information that is connected or linked to an individual, like his or her birthdate, birthplace, or mother's maiden name.

48.    Data thieves regularly target businesses in the technology industry like Defendants due to the highly sensitive information that such entities maintain. Defendants knew and understood that unprotected Private Information is highly sought after by criminals who seek to illegally monetize that Private Information through unauthorized access.

49.    Cyber-attacks against institutions such as Defendants are targeted and frequent.

50.    In light of past high profile data breaches at industry-leading companies, including, for example, Microsoft (250 million records, December 2019), Wattpad (268 million records, June 2020), Facebook (267 million users, April 2020), Estee Lauder (440 million records, January 2020), Whisper (900 million records, March 2020), and Advanced Info Service (8.3 billion records, May 2020), Defendants knew or, if acting as reasonable businesses handling PII, should

10

have known that the Private Information it collected and maintained would be vulnerable to and targeted by cybercriminals.

51.    As sophisticated company in possession of numerous individuals' Private Information, Defendants knew, or should have known, the importance of safeguarding the Private Information entrusted to it by Plaintiff and Class Members and of the foreseeable consequences if it or its vendor's systems were breached. Such consequences include the significant costs imposed on Plaintiff and Class Members due to a breach. Nevertheless, Defendants failed to implement or follow reasonable cybersecurity measures to protect against the Data Breach.

52.    Despite the prevalence of public announcements of data breach and data security compromises, Defendants failed to take appropriate steps to protect the Private Information of Plaintiff and Class Members from being compromised.

53.    Given the nature of the Data Breach, it was foreseeable that Plaintiff's and Class Members' Private Information compromised therein would be targeted by hackers and cybercriminals for use in variety of different injurious ways. Indeed, the cybercriminals who possess Plaintiff's and Class Members' Private Information can easily obtain their tax returns or open fraudulent credit card accounts in Plaintiff's and Class Members' names.

54.    Plaintiff and Class Members were the foreseeable and probable victims of Defendants inadequate security practices and procedures. Defendants knew or should have known of the inherent risks in collecting and storing Private Information and the critical importance of providing adequate security for that information.

55.    The breadth of data compromised in the Data Breach makes the information particularly valuable to thieves and leaves Plaintiff and Class Members especially vulnerable to identity theft, tax fraud, credit and bank fraud, and the like.

**E.     Defendants Were Required, But Failed to Comply with FTC Rules and Guidance.**

56.     The FTC has promulgated numerous guides that highlight the importance of implementing reasonable data security practices. According to the FTC, data security should be factored into all business decision-making.

57.     In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*,[7] which establishes cyber-security guidelines for businesses like Defendants. These guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand its network's vulnerabilities; and implement policies to correct any security problems.

58.     The FTC's guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[8]

59.     The FTC further recommends that companies not maintain Private Information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

---

[7] *Protecting Personal Information: A Guide for Business*, FED. TRADE COMM. (2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited Jan. 16, 2026).
[8] *Id.*

60.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect third parties' confidential data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act. Orders resulting from these actions further clarify the measures business like Defendants must undertake to meet their data security obligations. *See, e.g., In the Matter of LabMD, Inc*., 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

61.     Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendants, of failing to use reasonable measures to protect Private Information. The FTC publications and orders described above also form part of the basis of Defendants duties in this regard.

62.     The FTC has also recognized that consumer data is a new and valuable form of currency. In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour stated that "most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis and profit."[9]

63.     Defendants failed to properly implement basic data security practices, in violation of their duties under the FTC Act.

---

[9] Statement of FTC Commissioner Pamela Jones Harbour (Remarks Before FTC Exploring Privacy Roundtable), http://www.ftc.gov/speeches/harbour/091207privacyroundtable.pdf.

64.     Defendants failures to employ reasonable and appropriate means to protect against unauthorized access to Plaintiff's and Class Members' Private Information or to comply with applicable industry standards constitutes an unfair act or practice prohibited by the FTC Act.

**F.    Defendants Failed to Comply with Industry Standards.**

65.     A number of industry and national best practices have been published and are widely used as a go-to resource when developing an institution's cybersecurity standards.

66.     The Center for Internet Security's (CIS) Critical Security Controls (CSC) recommends certain best practices to adequately secure data and prevent cybersecurity attacks, including Critical Security Controls of Inventory and Control of Enterprise Assets, Inventory and Control of Software Assets, Data Protection, Secure Configuration of Enterprise Assets and Software, Account Management, Access Control Management, Continuous Vulnerability Management, Audit Log Management, Email and Web Browser Protections, Malware Defenses, Data Recovery, Network Infrastructure Management, Network Monitoring and Defense, Security Awareness and Skills Training, Service Provider Management, Application Software Security, Incident Response Management, and Penetration Testing.

67.     In addition, the NIST recommends certain practices to safeguard systems,  infra, such as the following:

a.   Control who logs on to your network and uses your computers and other devices.

b.   Use security software to protect data.

c.   Encrypt sensitive data, at rest and in transit.

d.   Conduct regular backups of data.

e.   Update security software regularly, automating those updates if possible.

f.   Have formal policies for safely disposing of electronic files and old devices; and

g.  Train everyone who uses your computers, devices, and network about cybersecurity.

68.    Further still, the Cybersecurity & Infrastructure Security Agency makes specific recommendations to organizations to guard against cyberattacks, including (a) reducing the likelihood of a damaging cyber intrusion by validating that "remote access to the organization's network and privileged or administrative access requires multi-factor authentication, [e]nsur[ing] that software is up to date, prioritizing updates that address known exploited vulnerabilities identified by CISA[,] [c]onfirm[ing] that the organization's IT personnel have disabled all ports and protocols that are not essential for business purposes," and other steps; (b) taking steps to quickly detect a potential intrusion, including "[e]nsur[ing] that cybersecurity/IT personnel are focused on identifying and quickly assessing any unexpected or unusual network behavior, [e]nabl[ing] logging in order to better investigate issues or events[,] and [c]onfirm[ing] that the organization's entire network is protected by antivirus/antimalware software and that signatures in these tools are updated"; (c) "[e]nsur[ing] that the organization is prepared to respond if an intrusion occurs," and; (d) other steps.[10]

69.    Upon information and belief, Defendants failed to implement industry standard cybersecurity measures, including failing to meet the minimum standards of one or more of the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are established frameworks for reasonable cybersecurity readiness, as well as failing to comply with

---

[10] Cybersecurity & Infrastructure Security Agency, "Shields Up: Guidance for Organizations," available at https://www.cisa.gov/shields-guidance-organizations (last visited Jan. 16, 2026).

other industry standards for protecting Plaintiff's and Class Members' Private Information, resulting in the Data Breach.

**G.      Defendants Owed Common Law Duties to Safeguard PII.**

70.      In addition to their obligations under federal and state laws, Defendants owed a duty to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in is and/or its vendors' possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. These duties owed to Plaintiff and Class Members obligated Defendants to provide reasonable data security consistent with industry standards and requirements to protect Plaintiff's and Class Members' Private Information from unauthorized disclosure.

71.      Defendants owed duties to Plaintiff and Class Members to create and implement reasonable data security practices and procedures to protect the Private Information in their and/or their vendors' possession, including adequately training its employees and others who accessed Private Information on how to adequately protect Private Information.

72.      Defendants owed duties to Plaintiff and Class Members to implement processes that would detect a compromise of Private Information in a timely manner.

73.      Defendants owed duties to Plaintiff and Class Members to act upon data security warnings and alerts in a timely fashion.

74.      Defendants owed duties to Plaintiff and Class Members to disclose in a timely and accurate manner when and how the Data Breach occurred.

75.      Defendants owed duties to Plaintiff and Class Members because they were foreseeable and probable victims of any inadequate data security practices.

76.     Defendants failed to take the necessary precautions to safeguard and protect Plaintiff's and Class Members' Private Information from unauthorized disclosure. Defendants' actions and omissions represent a flagrant disregard of Plaintiff's and Class Members' rights.

**H.     Plaintiff and Class Members Suffered Common Injuries and Damages due to Defendants Conduct.**

77.     Defendants' failure to use adequate data security measures for Plaintiff's and Class Members' Private Information directly and proximately caused injuries to Plaintiff and Class Members via their Private Information's wrongful disclosure in the Data Breach.

78.     The ramifications of Defendants failures to keep secure the Private Information of Plaintiff and Class Members are long lasting and severe. Once Private Information is stolen fraudulent use of that information and damage to victims may continue for years.

79.     Plaintiff and Class Members are also at a continued risk because their Private Information remains in Defendants systems and/or their third-party vendors systems, which have already been shown to be susceptible to compromise and are subject to further attack so long as Defendants fail to undertake the necessary and appropriate security and training measures to protect individuals' Private Information.

80.     As a result of Defendants ineffective and inadequate data security practices, the consequential Data Breach, and the foreseeable outcome of Plaintiff's and Class Members' Private Information ending up in criminals' possession, all Plaintiff and Class Members have suffered and will continue to suffer the following actual injuries and damages, without limitation:  (a) invasion of privacy; (b) financial costs incurred mitigating the materialized risk and imminent threat of identity theft; (c) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft; (d) financial costs incurred due to actual identity theft; (e) loss of time incurred due to actual identity theft; (f) deprivation of value of their Private Information; (g)

loss of the benefit of their bargain with Defendants; (h) emotional distress including anxiety and stress in dealing with the Data Breach's aftermath; and (i) the continued risk to their sensitive Private Information, which remains in Defendants possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake adequate measures to protect it.

### Present and Ongoing Risk of Identity Theft

81.     Plaintiff and Class Members are at a heightened risk of identity theft for years to come because of the Data Breach.

82.     The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[11] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[12]

83.     The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal Private Information to monetize the information. Criminals monetize the data by selling the stolen information on the internet black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

84.     The dark web is an unindexed layer of the internet that requires special software or authentication to access.[13] Criminals in particular favor the dark web as it offers a degree of anonymity to visitors and website publishers. Unlike the traditional or "surface" web, dark web

---

[11] 17 C.F.R. § 248.201 (2013).
[12] *Id.*
[13] *What Is the dark web?*, Experian, available at https://www.experian.com/blogs/ask-experian/what-is-the-dark-web/.

users need to know the web address of the website they wish to visit in advance. For example, on the surface web, the CIA's web address is cia.gov, but on the dark web it is ciadotgov4sjwlzihbbgxnqg3xiyrg7so2r2o3lt5wz5ypk4sxyjstad.onion.

85.    A sophisticated black market exists on the dark web where criminals can buy or sell malware, firearms, drugs, and frequently, PII like the Private Information at issue here.[14] The digital character of Private Information stolen in data breaches lends itself to dark web transactions because it is immediately transmissible over the internet and the buyer and seller can retain their anonymity. The sale of a firearm or drugs on the other hand requires a physical delivery address. Nefarious actors can readily purchase usernames and passwords for online streaming services, stolen financial information and account login credentials, and Social Security numbers, dates of birth, and medical information.[15] As Microsoft warns "[t]he anonymity of the dark web lends itself well to those who would seek to do financial harm to others."[16]

86.    The unencrypted Private Information of Plaintiff and Class Members will end up for sale on the dark web because that is the *modus operandi* of hackers. In addition, unencrypted and detailed Private Information may fall into the hands of companies that will use it for targeted marketing without the approval of Plaintiff and Class Members. Unauthorized actors can easily access and misuse Plaintiff's and Class Members' Private Information due to the Data Breach.

87.    Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take

---

[14] *What is the dark web?* – Microsoft 365, available at https://www.microsoft.com/en-us/microsoft-365-life-hacks/privacy-and-safety/what-is-the-dark-web.
[15] *Id.; What Is the dark web?*, Experian, available at https://www.experian.com/blogs/ask-experian/what-is-the-dark-web/.
[16] *What is the dark web?* – Microsoft 365, available at https://www.microsoft.com/en-us/microsoft-365-life-hacks/privacy-and-safety/what-is-the-dark-web.

on the victim's identity, or to track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

88.    For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data breaches are often the starting point for these additional targeted attacks on the victims.

89.    Social Security numbers, for example, are among the worst kind of personal information to have stolen because they may be put to numerous serious fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[17]

90.    What's more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of

---

[17] Social Security Administration, *Identity Theft and Your Social Security Number*, available at: https://www.ssa.gov/pubs/EN-05-10064.pdf.

misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

91.     Even then, new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[18]

92.     Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant issued in the victim's name. And the Social Security Administration has warned identity thieves can use someone's Social Security number to apply for credit lines.

93.     One such example of criminals piecing together bits and pieces of compromised Private Information for profit is the development of "Fullz" packages.[19]

---

[18] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last visited Jan. 16, 2026).

[19] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen from Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014),

94.     With Fullz packages, cyber-criminals can cross-reference two sources of Private Information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals.

95.     The development of Fullz packages means here that the stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiff's and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the Private Information that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

96.     Thus, even if certain information (such as driver's license numbers) was not stolen in a breach, criminals can still create a comprehensive Fullz package. Then, this comprehensive dossier can be sold—and then resold in perpetuity—to crooked operators and other criminals (like illegal and scam telemarketers).

97.     The development of Fullz packages means that stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiff's and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. That is exactly what is happening to Plaintiff and Class Members, and it is reasonable for any trier of fact, including this Court or a jury, to find that their stolen Private Information is being misused, and that such misuse is traceable to the Data Breach.

---

https://krebsonsecuritv.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm (last visited Jan. 16, 2026).

98.    Victims of identity theft can suffer from both direct and indirect financial losses. According to a research study published by the Department of Justice,

> A direct financial loss is the monetary amount the offender obtained from misusing the victim's account or personal information, including the estimated value of goods, services, or cash obtained. It includes both out-of-pocket loss and any losses that were reimbursed to the victim. An indirect loss includes any other monetary cost caused by the identity theft, such as legal fees, bounced checks, and other miscellaneous expenses that are not reimbursed (e.g., postage, phone calls, or notary fees). All indirect losses are included in the calculation of out-of-pocket loss.[20]

99.    According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that year, resulting in more than $3.5 billion in losses to individuals and business victims.[21]

100.    Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

101.    Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the stolen Private Information. To protect themselves, Plaintiff and Class Members will need to remain vigilant for years or even decades to come.

### *Loss of Time to Mitigate the Risk of Identify Theft and Fraud*

102.    In addition to out-of-pocket expenses that can exceed thousands of dollars and the emotional toll identity theft can take, some victims must spend a considerable time repairing the damage caused by the theft of their Private Information. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously

---

[20] Erika Harrell, *Bureau of Just. Stat.*, U.S. DEP'T OF JUST., NCJ 256085, *Victims of Identity Theft*, 2018 I (2020) https://bjs.ojp.gov/content/pub/pdf/vit18.pdf (last visited Jan. 16, 2026).
[21] *See* https://www.fbi.gov/news/stories/2019-internet-crime-report-released-021120.

monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

103.    As a result of the recognized risk of identity theft, when a data breach occurs, and an individual is notified by a company that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm—yet the asset of time has been lost.

104.    In the event that Plaintiff and Class Members experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record

105.    Thus, due to the actual and imminent risk of identity theft, Plaintiff and Class Members must monitor their accounts for many years to mitigate that harm.

106.    Plaintiff and Class Members have spent time, and will spend additional time in the future, on a variety of prudent actions, such as placing freezes and alerts with credit reporting agencies, contacting financial institutions, closing or modifying financial accounts, changing passwords, reviewing and monitoring credit reports and accounts for unauthorized activity, and filing police reports, which may take years to discover.

107.    These efforts are consistent with the steps that FTC recommends that data breach victims take several steps to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports,

contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[22]

108.    Once Private Information is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or contained against future misuse. For this reason, Plaintiff and Class Members will need to maintain these heightened measures for years, and possibly their entire lives, as a result of Defendants conduct that caused the Data Breach.

### *Diminished Value of Private Information*

109.    Private Information is a valuable property right.[23] Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. This obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.

110.    For example, drug and medical device manufacturers, pharmacies, hospitals, and other healthcare service providers often purchase Private Information on the black market for the purpose of target-marketing their products and services to the physical maladies of the data breach victims themselves. Insurance companies purchase and use wrongfully disclosed PHI to adjust their insureds' medical insurance premiums.

111.    Private Information can sell for as much as $363 per record.

112.    An active and robust legitimate marketplace for Private Information also exists. In 2019, the data brokering industry was worth roughly $200 billion. In fact, the data marketplace is

---

[22] *See* Federal Trade Commission, *Identity Theft.gov*, https://www.identitytheft.gov/Steps (last visited Jan. 16, 2026).

[23] *See, e.g.*, John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PRIVATE INFORMATION") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PRIVATE INFORMATION, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers. Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50 a year.

113.    As a result of the Data Breach, Plaintiff's and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished in its value by its unauthorized and likely release onto the dark web, where it holds significant value for the threat actors.

114.    However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, the Private Information is now readily available, and the rarity of the data has been lost, thereby causing additional loss of value.

### *Reasonable and Necessary Future Cost of Credit Monitoring*

115.    To date, Defendants have done little to nothing to provide Plaintiff and Class Members with relief for the damages they suffered due to the Data Breach.

116.    Given the type of targeted attack in this case and sophisticated criminal activity, the type of Private Information, and the *modus operandi* of cybercriminals, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the Private Information for identity theft crimes—*e.g.*, opening bank accounts in the victims' names to make purchases or to launder money, filing false tax returns, taking out loans or lines of credit, or filing false unemployment claims.

117.    Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that her or his Social Security number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

118.    Furthermore, the information accessed and disseminated in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach, where victims can easily cancel or close credit and debit card accounts. The information disclosed in this Data Breach is impossible to "close" and difficult, if not impossible, to change (such as Social Security numbers).

119.    Consequently, Plaintiff and Class Members are at a present and ongoing risk of fraud and identity theft for many years into the future, if not forever.

120.    The retail cost of credit monitoring and identity theft monitoring can cost $200 or more a year per Class Member. This is a reasonable and necessary cost to protect Class Members from the risk of identity theft that arose from Defendants Data Breach. This is a future cost for a minimum of five years that Plaintiff and Class Members would not need to bear but for Defendants failure to safeguard their Private Information.

## V.  PLAINTIFF'S EXPERIENCES AND INJURIES

121.    Upon information and belief, Plaintiff was an employee of Defendant Penn, and as a condition of employment was required to provide Defendants with her Private Information.

122.    On or about December 1, 2025, Plaintiff received a notice letter from Defendant Penn informing her that her Private Information, including her name, Social Security number, address, and banking information, were compromised in the Data Breach.[24]

123.    Plaintiff greatly values her privacy and is very careful about sharing her sensitive Private Information. Plaintiff diligently protects her Private Information and stores any documents containing Private Information in a safe and secure location. She has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

124.    Plaintiff would not have provided her Private Information to Defendants had she known it would be kept using inadequate data security and vulnerable to a cyberattack.

125.    At the time of the Data Breach, Defendants retained Plaintiff's Private Information with inadequate data security, causing her Private Information to be accessed and exfiltrated by cybercriminals in the Data Breach.

126.    Plaintiff has made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching the Data Breach, reviewing financial account statements and other information, and taking other protective and ameliorative steps in response to the Data Breach. This is time that was lost and unproductive and took away from other activities and money-making opportunities. Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

127.    Due to the Data Breach, Plaintiff is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come. The risk of identity theft is impending and has materialized, as there is evidence that Plaintiff's and Class Members' Private Information was targeted, accessed, misused, and has or will imminently be disseminated on the dark web, as

---

[24] *Exhibit A*, Plaintiff's Notice Letter.

that is the *modus operandi* of cybercriminals that commit attacks of this type.

128.    The Data Breach has caused Plaintiff to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendants have still not fully informed her of key details about the Data Breach's occurrence or the information stolen.

## VI.    CLASS ACTION ALLEGATIONS

129.    Plaintiff brings this nationwide class action on behalf of herself and all others similarly situated pursuant to Federal Rule of Civil Procedure 23(b)(2), 23(b)(3), and 23(c)(4).

130.    The class Plaintiff seeks to represent is defined as follows:

> All individuals in the United States whose Private Information may
> have been compromised in the Data Breach ("Class").

131.    Excluded from the Class are the following individuals and/or entities: Defendants and Defendants parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendants have a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

132.    Plaintiff reserve the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

133.    **Numerosity:** The Class is so numerous that joinder of all members is impracticable. Upon information and belief, the Class is comprised of thousands of members.

134.    **Commonality:** Questions of law and fact common to the Class exist and predominate over any questions affecting only individual Class Members. These include:

a.    Whether Defendants unlawfully used, maintained, lost, or disclosed Plaintiff's and Class Members' Private Information;

b.  Whether and to what extent Defendants had a duty to protect the Private Information of Plaintiff and Class Members;

c.  Whether Defendants had duties not to disclose the Private Information of Plaintiff and Class Members to unauthorized third parties;

d.  Whether Defendants had duties not to use the Private Information of Plaintiff and Class Members for non-business purposes;

e.  Whether Defendants knew or should have known of the data security vulnerabilities that allowed the Data Breach to occur;

f.  Whether Defendants failed to adequately safeguard the Private Information of Plaintiff and Class Members;

g.  Whether Defendants data security systems and procedures prior to, during, and since the Data Breach complied with industry standards;

h.  Whether Defendants adequately, promptly, and accurately informed Plaintiff and Class Members their Private Information had been compromised;

i.  Whether Defendants violated data breach notification laws by failing to promptly notify Plaintiff and Class Members that their Private Information had been compromised;

j.  Whether Defendants conduct violated the FTC Act;

k.  Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the Private Information compromised in the Data Breach;

l.  Whether Defendants adequately addressed and fixed the vulnerabilities that permitted the Data Breach to occur;

m. Whether Defendants were unjustly enriched by failing to provide adequate security for Plaintiff's and Class Members' Private Information;

n. Whether Plaintiff and Class Members are entitled to actual, consequential, nominal, statutory, and/or punitive damages as a result of Defendants wrongful conduct; and

o. Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm the Data Breach caused.

135. **Typicality:** Plaintiff's claims are typical of other Class Members' claims because Plaintiff and Class Members were subject to the same unlawful conduct as alleged herein, and were damaged in the same way. Plaintiff's Private Information was in Defendants possession at the time of the Data Breach and was compromised due to the Data Breach. Plaintiff's damages and injuries are akin to those of other Class Members and Plaintiff seek relief consistent with the relief of the Classes.

136. **Adequacy:** Plaintiff are adequate representatives of the Class because Plaintiff is a Class Member, and is committed to pursuing this matter against Defendants to obtain relief for the Class. Plaintiff has no conflicts of interest with the Class. Plaintiff's Counsel are competent and experienced in litigating class actions, including extensive experience in data breach and privacy litigation. Plaintiff intends to vigorously prosecute this case and will fairly and adequately protect the interests of the Class.

137. **Superiority:** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The purpose of the class action mechanism is to permit litigation against wrongdoers even when damages to Plaintiff and Class Members may not be sufficient to justify individual litigation. Here, the damages suffered by Plaintiff and Class

Members are relatively small compared to the burden and expense required to individually litigate their claims against Defendants, and thus, individual litigation to redress Defendants wrongful conduct would be impracticable. Individual litigation by each Class Member would also strain the court system. Individual litigation creates the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

138.    **Manageability:** The litigation of the class claims alleged herein is manageable. Defendants uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates there would be no significant manageability problems with prosecuting this lawsuit as a class action. Adequate notice can be given to Class Members directly using information maintained in Defendants records.

139.    **Ascertainability:** All members of the proposed Class are readily ascertainable. The Class is defined by reference to objective criteria, and there is an administratively feasible mechanism to determine who fits within the Class. Defendants have access to information regarding the individuals affected by the Data Breach, and Defendants have already provided notifications to some or all of those people. Using this information, the members of the Class can be identified, and their contact information ascertained for purposes of providing notice.

## VII.    CAUSES OF ACTION

### COUNT I: NEGLIGENCE/NEGLIGENCE *PER SE*
### (On Behalf of Plaintiff and the Class)

140.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 139 above, as if fully set forth herein.

141.    Defendants required Plaintiff and Class Members to submit, directly or indirectly, personal, confidential Private Information.

142.    Plaintiff and Class Members provided certain Private Information to Defendants including their names and Social Security numbers, and other sensitive information.

143.    Defendants had full knowledge of the sensitivity of the Private Information to which it was entrusted, and the types of harm that Plaintiff and Class Members could and would suffer if the Private Information was wrongfully disclosed to unauthorized persons. Defendants had duties to Plaintiff and each Class Member to exercise reasonable care in holding, safeguarding, and protecting their Private Information.

144.    Plaintiff and Class Members were the foreseeable victims of any inadequate safety and security practices by Defendants.

145.    Plaintiff and Class Members had no ability to protect their Private Information in Defendants' possession.

146.    By collecting and storing Plaintiff's and Class Members' Private Information, Defendants had a duty of care to use reasonable means to secure and safeguard it, to prevent disclosure of the information, and to safeguard the Private Information from theft.

147.    Defendants owed a duty to Plaintiff and Class Members to provide data security consistent with industry standards and legal and regulatory requirements, to ensure that their systems and the personnel responsible for them adequately protected Plaintiff's and Class Members' Private Information.

148.    Defendants were able to ensure that their systems and data security procedures were sufficient to protect against the foreseeable risk of harm to Plaintiff and Class Members from a cybersecurity event like this Data Breach, whereas Plaintiff and Class Members were not.

149.    Defendants had a duty to employ reasonable security measures under Section 5 of the FTC Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

150.    Pursuant to the FTC Act, Defendanst had a duty to provide adequate systems and data security practices to safeguard Plaintiff's and Class Members' Private Information.

151.    Defendants breached their duties to Plaintiff and Class Members under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' Private Information and by failing to encrypt or timely delete the Private Information from its network systems.

152.    Defendants' violations of the FTC Act as described herein directly caused and/or were a substantial factor in the Data Breach and resulting injuries to Plaintiff and Class Members.

153.    Plaintiff and Class Members are within the class of persons the FTC Act was intended to protect.

154.    The type of harm that resulted from the Data Breach was the type of harm the FTC Act was intended to guard against.

155.    Defendants' failures to comply with the FTC Act is negligence *per se.*

156.    Defendants' duties to use reasonable care in protecting Plaintiff's and Class Members' Private Information arose not only as a result of the statutes and regulations described above, but because Defendants are bound by industry standards to secure such Private Information.

157.    Defendants breached their duties and were negligent by failing to use reasonable measures to protect Plaintiff's and Class Members' Private Information from unauthorized

disclosure in the Data Breach. The specific negligent acts and omissions committed by Defendants include, but are not limited to, the following:

    a.  Failing to adopt, implement, and maintain adequate security measures to safeguard Plaintiff's and Class Members' Private Information;

    b.  Failing to adequately train employees on proper cybersecurity protocols;

    c.  Failing to adequately monitor the security of their information technology networks and systems;

    d.  Failure to periodically ensure that their network systems had plans in place to maintain reasonable data security safeguards; and

    e.  Allowing unauthorized access to Plaintiff's and Class Members' Private Information.

158.    But for Defendants wrongful and negligent breaches of its duties owed to Plaintiff and Class Members, the Data Breach would not have occurred or at least would have been mitigated, Plaintiff's and Class Members' Private Information would not have been compromised, and Plaintiff's and Class Members' injuries would have been avoided.

159.    It was foreseeable that Defendants' failures to use reasonable measures to protect Plaintiff's and Class Members' Private Information would injure Plaintiff and Class Members. Further, the breach of security was reasonably foreseeable to Defendants given the known high frequency of cyber-attacks and data breaches in Defendants industry.

160.    It was therefore foreseeable that the failure to adequately safeguard Plaintiff's and Class Members' Private Information would cause them one or more types of injuries.

161.    As a direct and proximate result of Defendants negligence, Plaintiff and Class Members have suffered and will suffer injuries and damages, including but not limited to (a) invasion of privacy; (b) lost or diminished value of their Private Information; (c) actual identity

theft and fraud; (d) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to uncompensated lost time; (e) loss of benefit of their bargain; and (f) the continued and certainly increased risk to their Private Information, which remains (i) unencrypted and available for unauthorized third parties to access and abuse; and (ii) in Defendants possession and subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect it.

162.    As a direct and proximate result of Defendants' negligence, Plaintiff and Class Members have suffered and will continue to suffer other forms of injuries and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

163.    Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial.

### COUNT II: BREACH OF IMPLIED CONTRACT
**(On Behalf of Plaintiff and the Class)**

164.    Plaintiff re-alleges and incorporates by reference all of the allegations contained in paragraphs 1 through 139, as if fully set forth herein.

165.    Plaintiff and Class Members either directly contracted with Defendants or Plaintiff and Class Members were the third-party beneficiaries of contracts with Defendants.

166.    Plaintiff and Class Members (or their third-party agents) were required to provide their PII to Defendants as a condition of receiving employment provided by Defendant Oracle's Clients, including Defendant Penn.

167.    Plaintiff and Class Members (or their third-party agents) provided their PII to Defendants or their third-party agents in exchange for employment.

168.    Plaintiff and Class Members (or their third-party agents) reasonably understood that a portion of the funds derived from their labor would be used to pay for adequate cybersecurity measures.

169.    Plaintiff and Class Members (or their third-party agents) reasonably understood that Defendants would use adequate cybersecurity measures to protect the PII that they are required to provide based on Defendants' duties under state and federal law and their internal policies.

170.    Plaintiff and the Class Members (or their third-party agents) accepted Defendants offers by disclosing their PII to Defendants or their third-party agents in exchange for employment.

171.    In turn, and through internal policies, Defendants agreed to protect and not disclose the PII to unauthorized persons.

172.    Implicit in the parties' agreement was that Defendants would provide Plaintiff and Class Members (or their third-party agents) with prompt and adequate notice of all unauthorized access and/or theft of their PII.

173.    Plaintiff and Class Members (or their third-party agents) would not have entrusted their PII to Defendants (or their third-party agents) in the absence of such an agreement with Defendants.

174.    Plaintiff and the Class (or their third-party agents) fully performed their obligations under the implied contracts with Defendants.

175.    The covenant of good faith and fair dealing is an element of every contract. Thus, parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—and not merely the letter—of the bargain. In short, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to their form.

176. Subterfuge and evasion violate the duty of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or consist of inaction. And fair dealing may require more than honesty.

177. Defendants materially breached the contracts it entered with Plaintiff and Class Members (or their third-party agents) by:

    a.  failing to safeguard their information;

    b.  failing to notify them promptly of the intrusion into their computer systems that compromised such information.

    c.  failing to comply with industry standards;

    d.  failing to comply with the legal obligations necessarily incorporated into the agreements; and

    e.  failing to ensure the confidentiality and integrity of the electronic PII that Defendants created, received, maintained, and transmitted.

178. In these and other ways, Defendants violated their duty of good faith and fair dealing.

179. Defendants' material breaches were the direct and proximate cause of Plaintiff's and Class Members' injuries.

180. On information and belief, Plaintiff's PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

181. Plaintiff and Class Members (or their third-party agents) performed as required under the relevant agreements, or such performance was waived by Defendants conduct.

### COUNT III: UNJUST ENRICHMENT
#### (On Behalf of Plaintiff and the Class)

182. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 139 above, as if fully set forth herein.

183.    Plaintiff and Class Members conferred benefits on Defendants by way providing, directly or indirectly, their Private Information to Defendants as part of Defendants respective businesses.

184.    Defendants required Plaintiff's and Class Members' Private Information to conduct their respective businesses and generate revenue, which they could not do without collecting and maintaining Plaintiff's and Class Members' Private Information.

185.    The monies Plaintiff and Class Members paid to Defendants included a premium for Defendants cybersecurity obligations and were supposed to be used by Defendants, in part, to pay for the administrative and other costs of providing reasonable data security and protection for Plaintiff's and Class Members' Private Information.

186.    Additionally, a reasonable portion of the profit Defendants made should have been put towards data security measures that would adequately protect the Private Information in their care and/or their third-party vendors' care.

187.    Further, a reasonable portion of the costs Defendants saved through streamlining operations by using the Platform should have been put towards sufficient data security measures and oversight of their vendors' practices, to adequately protect the Private Information Plaintiff and Class Members entrusted to it.

188.    Instead, Defendants enriched themselves by saving the costs they reasonably should have expended on data security measures to secure Plaintiff's and Class Members' Private Information. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendants instead calculated to increase their own profits at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures and diverting those funds to Defendants' own coffers. Plaintiff and Class Members, on the other hand, suffered as a direct and

proximate result of Defendants' decision to prioritize their own profits over the requisite security and the safety of consumers' Private Information.

189.    Defendants failed to provide reasonable security, safeguards, and protections to the Private Information of Plaintiff and Class Members, and as a result, Defendants were unjustly enriched.

190.    Under principles of equity and good conscience, Defendants should not be permitted to retain their ill-gotten gains because they failed to provide adequate safeguards and security measures to protect Plaintiff's and Class Members' Private Information, which Plaintiff and Class Members paid for but did not receive.

191.    Defendants wrongfully accepted and retained these benefits—payment and Plaintiff's and Class Members' Private Information—and was enriched to the detriment of Plaintiff and Class Members.

192.    As a result of Defendants' wrongful conduct and resulting unjust enrichment, Plaintiff and Class Members are entitled to restitution and disgorgement of profits, benefits, and other compensation obtained by Defendants, plus reasonable attorneys' fees and costs.

## COUNT IV: DECLARATORY JUDGMENET
### (On Behalf of Plaintiff and the Class)

193.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 139 above, as if fully set forth herein.

194.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, et seq., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. The Court has broad authority to restrain acts, such as those alleged herein, which are tortious and unlawful.

195.    In the fallout of the Data Breach, an actual controversy has arisen about Defendants' various duties to use reasonable data security. On information and belief, Plaintiff alleges that Defendants' actions were—and still are—inadequate and unreasonable. And Plaintiff and Class Members continue to suffer injury from the ongoing threat of fraud and identity theft.

196.    Given its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a.   Defendants owed—and continues to owe—a legal duty to use reasonable data security to secure the data entrusted to them;

b.   Defendants have a duty to notify impacted individuals of the Data Breach under the common law and Section 5 of the FTC Act;

c.   Defendants breached, and continue to breach, their duties by failing to use reasonable measures to the data entrusted to them; and

d.   Defendants breach of their duties caused—and continues to cause—injuries to Plaintiff and Class Members.

197.    The Court should also issue corresponding injunctive relief requiring Defendants to use adequate security consistent with industry standards to protect the data entrusted to them.

198.    If an injunction is not issued, Plaintiff and the Class will suffer irreparable injury and lack an adequate legal remedy if Defendants experience a second data breach.

199.    And if a second breach occurs, Plaintiff and the Class will lack an adequate remedy at law because many of the resulting injuries are not readily quantified in full and they will be forced to bring multiple lawsuits to rectify the same conduct. Simply put, monetary damages—while warranted for out-of-pocket damages and other legally quantifiable and provable damages—cannot cover the full extent of Plaintiff and Class Members' injuries.

200.    If an injunction is not issued, the resulting hardship to Plaintiff and Class Members far exceeds the minimal hardship that Defendants could experience if an injunction is issued.

201.    An injunction would benefit the public by preventing another data breach—thus preventing further injuries to Plaintiff, Class Members, and the public at large.

## VIII.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of herself and all others similarly situated, prays for judgment as follows:

A.    An Order certifying this case as a class action on behalf the proposed Class, appointing Plaintiff as class representative, and appointing her counsel to represent the Class;

B.    Awarding Plaintiff and the Class damages that include applicable compensatory, actual, statutory, nominal, exemplary, and punitive damages, as allowed by law;

C.    Awarding declaratory and other equitable relief as is necessary to protect the interests of Plaintiff and the Class;

D.    Awarding injunctive relief in the form of additional technical and administrative cybersecurity controls as is necessary to protect the interests of Plaintiff and the Class;

E.    Enjoining Defendants from further deceptive practices and making untrue statements about their data security, the Data Breach, and the transmitted Private Information;

F.    Awarding attorneys' fees and costs, as allowed by law;

G.    Awarding prejudgment and post-judgment interest, as provided by law; and

H.    Awarding such further relief to which Plaintiff and the Class are entitled.

## IX.    DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues to triable.

Dated: January 16, 2026.                    Respectfully submitted,

*/s/ Joe Kendall*
Joe Kendall
Texas Bar No. 11260700
**KENDALL LAW GROUP, PLLC**
3811 Turtle Creek Blvd., Suite 825
Dallas, Texas 75219
Tel: 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
Fax: 214-744-3015
jkendall@kendalllawgroup.com

Jeff Ostrow (*pro hac vice* forthcoming)
**KOPELOWITZ OSTROW P.A.**
One West Las Olas Blvd, Suite 500
Fort Lauderdale, FL 33301
Tel: 954-525-4100
ostrow@kolawyers.com

Gary Klinger (*pro hac vice* forthcoming)
**MILBERG, PLLC**
227 W. Monroe Street, Ste. 2100
Chicago, Illinois 60606
Tel: 858-209-6941
gklinger@milberg.com

***Counsel for Plaintiff and the Putative Class***